## EMPLOYERS REINSURANCE CORPORATION v. BROOKS.

### No. 4031.

Court of Civil Appeals of Texas. Beaumont.
Oct. 6, 1942.

Rehearing Denied Oct. 21, 1942.

H. L. Edwards, of Nacogdoches, for appellant.

Sumner Williams, Jr., of Lufkin, for appellee.

O'QUINN, Justice.

This is a workmen's compensation case. Frost Lumber Industries, Inc., was the employer, appellee, M. L. Brooks, the employee, and appellant the compensation insurance carrier.

Among other things, appellee alleged that on or about February 11, 1941, he was engaged in the scope of his employment in attending a flooring machine in his employer's sawmill, and that it was his duty to tie the flooring lumber as it came out of the machine into bundles and place them in piles or stacks; that when he would catch up with that particular work he would do other jobs in and around the mill; that on said date he had caught up with the tieing of the flooring and was then running a piece of plank through an edger machine; that as he was so doing his left hand was caught in the edger machine, as a natural result of which he sustained serious accidental injuries to his hand; that the ligaments, nerves, and muscles of the first, second, third and fourth fingers of his left hand was severely torn, strained, traumatized and injured; that the bones in said fingers were broken and said fingers became stiff, sore and painful, and there is ankylosis of the joints of each of them, as a result of all of which he is nervous and weak when he attempts to use his left hand, and that he suffers excruciating pain when he attempts to use his hand; and that as a direct and natural result of said injuries he has suffered the total and permanent loss of the use of said fingers. He further alleged that at the date of said accident he was receiving $2.40 per day, but that he did not work substantially the whole of the year immediately preceding the date of his injury, but that there was another employee of appellant who did work for substantially the whole of the year immediately preceding the date of his said injury, in the same or similar capacity as appellee was working, in the same or similar employment in the same or neighboring place; that should he be mistaken as to there being another employee of appellant who had worked for substantially the whole of the preceding year, then that his average weekly wages should be ascertained in any manner just and fair to both the plaintiff and defendant, which would be the sum of $2.40 per day the same as he was receiving at the time he was injured.

Appellant answered by general denial, and specially that if appellee received the injuries by him plead that he did not receive same while engaged in the services he owed to his master, or in the course of his employment, but that if such injuries were received by appellee they were received by him while engaged in matters entirely outside of any duty he owed to his employer.

Appellant further answered that in the course of investigation of the accident, and before it could fully determine the matter, it had paid to appellee the sum of $86.40, which covered 12 weeks at $7.20, aggregating the sum of $86.40, when it determined that appellee under the undisputed facts was not entitled to compensation in any sum, and made no further payments, and prayed that appellee be refused any sum as compensation, and that appellant have judgment for costs of suit, but that if appellee be awarded compensation in any further sum, that then it have credit for the said sum of $86.40 it had already paid to appellee.

The case was tried to a jury on one special issue, to-wit:

"Special Issue No. 1.

"Do you find from a preponderance of the evidence that the injuries to the fingers of the left hand sustained by plaintiff on February 11, 1941, were injuries sustained by him in the course of his employment for Frost Lumber Industries Inc. of Texas.

"Answer Yes or No."

"To which the jury answered 'Yes'."

On the answer of the jury, judgment was rendered for the plaintiff, appellee, and motion for a new trial being overruled, appellant brings this appeal.

There is in the record an agreement by the parties that on February 11, 1941, appellee, M. L. Brooks, was an employee of the Frost Lumber Industries, Inc., of Tex-

as; that at the time he received his alleged injuries, his employer was carrying workmen's compensation insurance covering all his employees including appellee; that appellee duly gave notice to the Industrial Accident Board of his injuries with claim for compensation therefor; that said board duly made its award on said claim, and that appellee duly gave notice to said Board that he would not abide said award, and would file suit in a court of competent jurisdiction to set aside said award and to recover compensation for his injuries; and that he duly filed this suit for said purpose; that he received his injuries in Nacogdoches County, Texas, and that appellant paid him the sum of $86.40 (being for compensation for 12 weeks at the rate of $7.20 per week) as compensation for his said injuries, stipulating that said payment was for injuries sustained under the Workmen's Compensation Act only.

As we understand the agreement it admits and covers all the facts as true except the extent of the injuries received by appellee, nor that they were received in the course of his employment. We think the evidence as to the extent of injuries received by appellee was sufficient to support the verdict and consequent judgment. We do not believe that the evidence supports the verdict on the question of appellee having received his injuries while engaged in the performance and in the course of his employment. Appellee testified: That on February 11, 1941, he was working for appellant at its plant in Nacogdoches County, Texas, and was paid by it regularly for his work; that his job was to tie bundles of flooring behind a flooring machine, six pieces to the bundle and stack same; that some times the machine would stop and he would just sit around until it started up again; that on the occasion he received his injuries the machine was stopped and he noticed a piece of hardwood lumber (hickory) on the floor of the shed and "I wanted to split it open and make me a hammer handle"; that he picked up the piece of hardwood lumber and "I went to a machine and stuck it there and it was hard to go in." "What hand did you take to put it in? A. Right and it was hard to go in and I taken my left and the roller caught my hand and taken it in." He then testified that the first four fingers on his left hand were caught in the machine; that he could not pull his hand and fingers out of the machine and that he reached over and stopped the machine with his right hand; that he called Mr. Grant the foreman, and that he, Grant, and another man came and raised the roller up and got his hand out of the machine. We do not state any further of the evidence as to the extent of the injuries as we have already said that in our opinion it was sufficient to support the judgment.

On cross examination he testified:

"Q. They stopped the machine for some purpose that morning? A. Yes, sir.

"Q. When they stopped it, you didn't have anything else to do? A. No.

"Q. You were supposed to sit and wait until they got it repaired? A. Yes, to wait.

"Q. And after it was repaired and started, you started to tying? A. Yes, sir.

"Q. When it stopped you picked up a piece of hickory? A. Yes, sir. Hardwood.

"Q. A two-inch square piece, twenty-two or four inches long? A. About.

"Q. You took that and went to another machine? A. Yes, sir.

"Q. Some seventy-five or eighty feet from where you were working to where you went with it? A. I guess that's about right. I don't know.

"Q. Would you say about forty or fifty feet? Or what would you say? A. Forty or fifty feet.

"Q. You were going to cut this piece of wood into a hammer handle? A. Yes, sir.

"Q. Your employer—you employees don't make hammer handles over there? A. No, sir.

"Q. And your employer hadn't employed you to do that? A. No, sir.

"Q. Nor hadn't employed you to work at this machine where you were making the hammer handle? A. No.

"Q. You were making it of your own free will and accord? A. Yes, sir.

"Q. None of the foremen had instructed you to make it? A. No, sir.

"Q. Insofar as you knew, none of them knew you were making it? A. No.

"Q. You were going to use, put into your hammer? A. Yes, sir.

788

"Q. Going to carry it home with you and put it in your hammer and use it? A. Yes, sir."

On re-direct, among other things, he testified:

"Q. You stated their business was not making hammer handles? A. Yes, sir.

"Q. Why were you making it? A. For my use. I had an old hammer head at my house and where I worked I needed a hammer.

"Q. Why? A. When the old horse come loose, I would get a wrench and keep them up. I had an old hammer head and I would make a handle and put it in and bring it down there and keep the horses nailed down.

"Q. When the lumber came out of the machine, it come out on the horses? A. Yes, sir. When I would tie one end, I would put it back on the other end.

"Q. How were the horses tied together? A. Like carpenters use but larger.

"Q. What holds them together? A. Braces.

"Q. Do you use nails in them? A. Yes, sir.

"Q. Do they ever come loose? A. Yes, sir.

"Q. When did you do anything about driving them in? A. I made a—get a wrench from the tool box.

"Q. At the flooring machine? A. Yes, sir.

"Q. Your purpose in making the hammer was to use it in place of the wrench? A. Yes, sir.

"Q. You didn't have a hammer to use for that particular purpose? A. No.

"Q. He asked if any one instructed you to make one? A. That's right.

"Q. Did any of the foremen tell you to make one? A. No, sir."

On recross: "Did you ever ask your foreman for a hammer of any kind? A. No, sir.

"Q. Ever tell him you needed one? A. No.

"Q. It was your duty to tie flooring after it came out of the flooring machine? A. Yes.

"Q. They had a regular man to keep the horses and buggies in repair? A. Yes, but he didn't.

"Q. They had a regular man to. Your foreman never told you to repair them? A. No, sir."

G. H. Grant testified that he had worked for appellant twenty years as planing mill foreman, and that he had an assistant, a Mr. Nipper; that he knew the injured party, M. L. Brooks; that Brooks worked for appellant from about the second month in 1940 to the second month in 1941; that he remembered the occasion appellee received his injuries at the mill—that he, witness, was in the planing mill; that appellee's job was to tie lumber behind the flooring machine; that at the time he, Brooks, was injured he was trying to push a piece of lumber through the ripsaw machine; that he assisted in removing appellee from the ripsaw machine; that the piece of timber which appellee was trying to put through the machine was a piece of hickory one-half by one and three-fourths inches and about eighteen or twenty inches long which Brooks had picked up from the floor.

"Q. How come it there? A. We had been shipping some hickory that morning and this is a piece that we ripped off to make it uniform. We throw this trash over on the buggy and he picked it up from in front of the hog. We use it to make fuel."

He further testified that appellee Brooks did not tell him what he, Brooks, was attempting to do; that the machine was electrically operated; that appellee had not worked at that machine; that his duties did not require him to work at that machine; that the machine at which appellee worked was stopped every three or four hours to be sharpened; that appellee was supposed to wait until the machine was sharpened; that the time required while sharpening the machine was 15 minutes; that one would not have time to go from appellee's machine to the ripsaw machine and cut out a hammer handle; that appellee never did operate that machine, but it was operated by a man named Ickner; that it was a very dangerous machine and no one was allowed to work around it that was not familiar with it; that it was 215 feet from the machine where appellee was injured to the machine where he usually worked; that there were six other machines between the machine where appellee worked and the machine where he received his injuries. He further testified, among other things:

"Q. Did you ever at any time authorize Brooks to repair them? A. No.

"Q. Did you ever know of any occasion when he was driving nails on them? A. No.

"Q. Was that any part of his job at the planer mill? A. No.

"Q. Does Frost Lumber Industries manufacture hammer handles? A. No.

"Q.—Sell them? A. No.

"Q. Was it against the rules for the employees to nail those back? A. Yes.

"Q. Was it a written regulation? A. No.

"Q. Did you tell him not to nail them up? A. No.

"Q. Did you ever see him nail them back in? A. No.

"Q. You don't know if he did or not? A. No."

Louis Nipper testified in substance that he had worked for the appellant seventeen years; that he was assistant machine work foreman under Mr. Grant; that he knew appellee who tied lumber from the flooring machine; that at the time appellee got hurt he, the witness, was sharpening the machine at which appellee worked; that it would take some fifteen minutes to sharpen the machine and that appellee stood by usually and waited for the machine to be sharpened; that the electric ripsaw machine where appellee was injured was some 215 feet from the flooring machine where appellee worked; that Grant and himself had exclusive control of the machines in the shed; that appellee Brooks had no authority to nail anything to or on the machine, that to do so was no part of his duties; that Brooks got hurt trying to "rip a hammer handle out of that" (referring to a piece of hickory hardwood); that it was no part of Brook's duties to handle the hickory hardwood, or to try to rip it up on the ripsaw machine—had no connection with his regular job which was to tie flooring coming out of the flooring machine; that Frost Lumber Industries did not manufacture or sell hammer handles.

Appellant presents error in that the verdict of the jury is not supported by the evidence because same shows without dispute that appellee did not receive his injury while in the course of his employment or in the furtherance of his employer's business. We think this assignment must be sustained. We have stated practically all of the evidence. None of it shows that at the time of accident appellee was doing or attempting to do anything required of him by his contract of employment, but, according to his own testimony, he was engaged in making a hammer handle to be used for his own convenience. He says that he was not employed to make hammer handles, nor was he employed to do any kind of work at the ripsaw machine where he received his injuries; that he had not been instructed by any one to make the hammer handle and that none of them knew that he was doing so; that he had not been employed to work at the ripsaw machine, but that of his own free will he had picked up the hickory timber and gone to the ripsaw machine to rip it to the size he wanted in order to make a handle for his own hammer. The whole record shows without dispute that appellee was not engaged in the master's business, but in an enterprise of his own without his employer's knowledge or consent.

As the evidence seems to have been fully developed, and is without dispute, the judgment must be reversed, and judgment here rendered for appellant that appellee take nothing by his suit, and pay all costs of suit, and it is so ordered.

Reversed and rendered.